# STATE OF CONNECTICUT *v.* TREVOR MONROE OUTLAW
## (SC 20729)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Dannehy, Js.

*Syllabus*

Convicted of murder, carrying a pistol without a permit, and criminal possession of a firearm, the defendant appealed to this court. The defendant claimed, inter alia, that the trial court had abused its discretion when it failed to question or dismiss a juror who appeared to be sleeping during a portion of the trial and when it admitted evidence that the defendant's alleged coconspirator, R, who had testified pursuant to a cooperation agreement, pleaded guilty to conspiracy to commit murder in connection with the victim's murder. *Held*:

Because the trial court's inquiry regarding the allegedly sleeping juror, although limited in scope, adequately addressed the purported juror misconduct, the defendant could not demonstrate that he was deprived of his right to a fair trial.

Although the trial court improperly allowed certain witnesses to testify about their participation in a witness protection program, the defendant did not demonstrate that the admission of that testimony resulted in a manifest injustice requiring reversal.

Any error in the trial court's admission of evidence that R had pleaded guilty to conspiracy to commit murder, among other crimes, in connection with

State *v.* Outlaw

the victim's murder was harmless, as that evidence did not substantially impact the jury's verdict.

The prosecutor's remark during closing argument that R had taken responsibility for her actions by pleading guilty to conspiracy to commit murder did not violate the defendant's right to a jury trial, as that remark was a part of the prosecutor's argument that R was a reliable, credible witness, rather than an implicit criticism of the defendant's exercise of his right to have his case tried before a jury rather than to plead guilty, as R had done.

(*Two justices concurring in part and concurring in the judgment in one opinion*; *one justice concurring in part and dissenting in part*)

Argued February 14—officially released August 6, 2024*

*Procedural History*

Substitute information charging the defendant with the crimes of murder, conspiracy to commit murder, carrying a pistol without a permit, and criminal possession of a firearm, brought to the Superior Court in the judicial district of New Haven, where the court, *Vitale, J.*, denied the defendant's motion in limine to preclude evidence of a witness' plea agreement; thereafter, the charges of murder, conspiracy to commit murder and carrying a pistol without a permit were tried to the jury before *Vitale, J.*; subsequently, the court granted the defendant's motion for a judgment of acquittal as to the charge of conspiracy to commit murder; thereafter, verdict of guilty of murder and carrying a pistol without a permit; subsequently, the charge of criminal possession of a firearm was tried to the court, *Vitale, J.*; finding of guilty; judgment of guilty in accordance with the jury's verdict and the court's finding, from which the defendant appealed to this court. *Affirmed.*

*Pamela S. Nagy*, supervisory assistant public defender, for the appellant (defendant).

* August 6, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Outlaw

*Jonathan M. Sousa*, assistant state's attorney, with whom, on the brief, were *John P. Doyle, Jr.*, state's attorney, and *Seth R. Garbarsky* and *Jason Germain*, supervisory assistant state's attorneys, for the appellee (state).

*Opinion*

DANNEHY, J. In this appeal, the defendant, Trevor Monroe Outlaw, challenges his convictions of murder in violation of General Statutes § 53a-54a, criminal possession of a firearm in violation of General Statutes (Rev. to 2019) § 53a-217 (a) (1), and carrying a pistol without a permit in violation of General Statutes (Rev. to 2019) § 29-35 (a). The defendant claims that (1) the trial court abused its discretion by failing to question or dismiss a juror who appeared to be sleeping during a portion of the first day of evidence, (2) the trial court improperly admitted evidence related to witness protection, (3) the trial court improperly allowed a witness to testify that she had pleaded guilty to conspiracy to commit murder, and (4) the prosecutor improperly commented in closing argument on the defendant's right to a jury trial. We disagree with these claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the night that the victim, Giovanni Rodriguez, was killed, the defendant and his girlfriend, Cheenisa Rivera, asked Loretta Martin to reserve two rooms at the Comfort Inn and Suites in Meriden, one for Rivera and the defendant, and one for Rivera's daughter, Manasia Bennett, and her boyfriend, Freddy Hidalgo. Rivera and the defendant drove to Martin's house, where Martin booked the rooms electronically and Rivera paid her in crack cocaine, and then picked up Bennett and Hidalgo. Upon arriving at the hotel, Rivera checked in, gave Bennett and Hidalgo their room keys, and went with the defendant to park the car that she had rented.

State *v.* Outlaw

Unbeknownst to the defendant, the victim and his girlfriend, Derrika James, planned to spend the night at the same hotel. While James was in the lobby checking in, she encountered Bennett and Hidalgo. James heard Bennett state that the victim was in a car outside. Although there was no evidence that the defendant and the victim had a personally hostile relationship, they were members of rival gangs. Hidalgo instructed Bennett to call Rivera and warn her and the defendant. James returned to her car, and the victim drove them to the same side of the building where Rivera and the defendant had parked.

While she was standing in the parking lot, Rivera received the call from Bennett and activated her phone's speaker. Rivera and the defendant reentered her rental car, and Rivera drove toward James and the victim, who were near James' car, retrieving their belongings. As James and the victim got closer, the defendant fired a semiautomatic pistol out of the passenger window, striking the victim, who was later pronounced dead at the scene.

The defendant was subsequently charged with murder, conspiracy to commit murder, carrying a pistol without a permit, and criminal possession of a firearm.[1] Rivera was later arrested on unrelated charges and, in connection with the present case, pleaded guilty to conspiracy to commit murder and to hindering prosecution in the first degree. She and Martin testified against the defendant pursuant to cooperation agreements, both of which were admitted into evidence. After the prosecutor rested the state's case-in-chief, the court granted defense counsel's motion for a judgment of acquittal on the conspiracy charge. The jury found the

_____

[1] The defendant elected to have the criminal possession of a firearm charge tried to the court. The court canvassed him as to this decision and found that he knowingly, voluntarily, and intelligently waived his right to a jury trial on that count.

State *v.* Outlaw

defendant guilty of murder and carrying a pistol without a permit, and the trial court found the defendant guilty of criminal possession of a firearm. The trial court rendered judgment in accordance with the jury's verdict and the court's finding. The trial court thereafter sentenced the defendant to sixty-five years of imprisonment, and the defendant appealed from the judgment of conviction directly to this court pursuant to General Statutes § 51-199 (b) (3). Additional facts and procedural history will be set forth as necessary.

I

We first address the defendant's claim that the trial court should have questioned or dismissed a juror who appeared to be sleeping, and that its failure to do so requires reversal. During a recess on the first day of evidence, the court met with counsel in chambers and informed them that one of the jurors seemed to be having trouble staying awake. During this meeting, defense counsel "emphatically conveyed his desire that [the juror] *not* be removed from the jury at such time," because neither he nor his client had noticed the juror sleeping and because they were apprehensive about removing an African American juror.[2] (Emphasis in orig-

[2] The parties disagreed as to the substance of the in-chambers discussion, particularly whether defense counsel had objected to the removal of the juror in question. After the defendant filed this appeal, this court granted the state permission to file a late motion for rectification of the record. The trial court granted the motion for rectification and subsequently augmented the record with additional facts. Although the trial court recalled defense counsel's use of the word " 'objection,' " it declined to make a definitive finding regarding the use of that term. Nevertheless, the trial court found that "defense counsel's concern was abundantly clear." At oral argument on the motion, defense counsel acknowledged discussing the issue in chambers but maintained that he had taken no position on the juror's removal. Although the defendant argues that the rectification was improper, Practice Book § 66-5 provides that a motion for review pursuant to Practice Book § 66-7 is the sole remedy for a party desiring appellate review of a rectification ordered during the pendency of an appeal. In this instance, the defendant filed such a motion, and, although this court granted review, we denied the relief requested therein. The defendant's claim that we should not consider the augmented record is, thus, unavailing.

State *v.* Outlaw

inal.) Following the recess, the court stated on the record that one of the jurors had appeared to be asleep from approximately 2:30 to 3:30 p.m., and that it had discussed these observations with counsel in chambers.[3] Both prosecutors also claimed to have seen the juror sleeping and noted that this behavior also appeared to have occurred in the morning session and during the court's introductory remarks. Defense counsel stated that, although he could not say that the juror had *not* been sleeping, neither he nor the defendant had seen him doing so. The court urged defense counsel to observe the juror for the rest of the day and stated that it would not act at that point but would consider excusing the juror if the behavior continued.

After the jury was excused for the day, the prosecutor noted that he had seen the same juror sleeping when testimony resumed following the in-chambers meeting and subsequent discussion on the record. Defense counsel acknowledged that the juror might have been "nodding off," although he added that he was looking at the juror "through three sheets of plastic" and "could barely see the guy . . . ."[4] The court stated that it realized the juror was "African American . . . [and was] sensitive to . . . the defense, with respect to that," expressed that it would continue to watch him, and encouraged counsel to do the same.[5] Defense counsel responded

---

[3] The court added that the courtroom clerk, the court recording monitor, and at least two of the judicial marshals also claimed that they had observed this behavior.

[4] This case was tried shortly after jury trials resumed following a lengthy statewide suspension prompted by the COVID-19 pandemic. As the trial court observed, "numerous special precautions were undertaken, such as utilizing plexiglass throughout the courtroom . . . and the issuance of special instructions to the jury related to health precautions." The jurors were also wearing masks.

[5] We observe that the trial court's comment expressing its sensitivity to the defendant's position was the only reference to the juror's race during the trial. Indeed, the court expressly stated in its rectification order that, "absent defense counsel's in-chambers concerns, no conceivable reason exists as to why the undersigned would have remarked on the physical characteristics of a juror."

State *v.* Outlaw

that he understood and did not ask the court to take any further action. At the end of the second day of evidence, the court indicated that it had not seen a recurrence of the juror's behavior, and the issue was not raised again.

Before this court, the defendant argues that he was deprived of a fair trial because the trial court failed to act after the juror in question "looked to be asleep" during the presentation of evidence. The state contends that this claim has been waived because the defense induced the court not to question or remove the juror and that, even if this court does review the claim, the trial court reasonably determined, after conferring with counsel, that no further action was warranted. We conclude that the defendant has not satisfied his burden of showing that his right to a fair trial was infringed.

Although the parties agree that this issue is unpreserved, the defendant claims that it is nonetheless reviewable pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Alternatively, the defendant seeks review under the plain error doctrine. See *State* v. *Blaine*, 334 Conn. 298, 306, 221 A.3d 798 (2019).

"Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate [the] harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *State* v. *Johnson*,

State *v.* Outlaw

345 Conn. 174, 189, 283 A.3d 477 (2022). "[A] party satisfies the third prong of *Golding* if he or she makes a showing sufficient to establish a constitutional violation." *In re Yasiel R.*, supra, 317 Conn. 780–81. Even if these conditions are met, however, this court has declined to review claims of induced error, which occurs when the complaining party, "through conduct, encouraged or prompted the trial court to make the erroneous ruling." (Internal quotation marks omitted.) *State* v. *Cruz*, 269 Conn. 97, 105 n.8, 848 A.2d 445 (2004).

It is well established that juror misconduct warrants reversal when it has prejudiced the defendant to the extent that he has not received a fair trial. See, e.g., *State* v. *Hughes*, 341 Conn. 387, 417–18, 267 A.3d 81 (2021). A trial court's investigation of juror misconduct "is a delicate and complex task," and, in such instances, the court has "broad flexibility . . . ." (Internal quotation marks omitted.) *United States* v. *Cox*, 324 F.3d 77, 86 (2d Cir.), cert. denied, 540 U.S. 854, 124 S. Ct. 143, 157 L. Ed. 2d 97 (2003), and cert. denied, 540 U.S. 859, 124 S. Ct. 163, 157 L. Ed. 2d 108 (2003). More specifically, "[a] court has considerable discretion in deciding how to handle a sleeping juror . . . ." (Internal quotation marks omitted.) *Johnson* v. *Nicholson*, 349 Fed. Appx. 604, 605 (2d Cir. 2009). The few Connecticut cases that have involved allegations of a sleeping juror are largely inapposite to the circumstances of the present case. Cf., e.g., *State* v. *Payne*, 63 Conn. App. 583, 588–89, 777 A.2d 731 (2001) (discussing whether defendant waived his claim that sleeping juror deprived him of fair trial), rev'd, 260 Conn. 446, 797 A.2d 1088 (2002). Several federal and state appellate courts, however, have held that, once the court becomes aware that a juror may have been sleeping, it has a duty to address the situation. See, e.g., *United States* v. *Barrett*, 703 F.2d 1076, 1083 (9th Cir. 1983) (failing to conduct hearing or investigate when juror reported that he had been sleeping was

State *v.* Outlaw

abuse of discretion); *People* v. *Franqui*, 123 App. Div. 3d 512, 512, 999 N.Y.S.2d 40 (2014) (court should have conducted "probing and tactful inquiry" when it was informed that juror was sleeping during deliberations (internal quotation marks omitted)), appeal denied, 25 N.Y.3d 1163, 36 N.E.3d 98, 15 N.Y.S.3d 295 (2015). Acknowledging the behavior and taking a "wait and see" approach is not necessarily a sufficient response. See, e.g., *Commonwealth* v. *McGhee*, 470 Mass. 638, 644–45, 25 N.E.3d 251 (2015) (reliable report of sleeping juror "requires prompt judicial intervention," and court erred by failing to conduct any inquiry (internal quotation marks omitted)).

This court has held that a trial court must conduct an inquiry into any allegations of juror misconduct presented in a criminal case, regardless of whether such an inquiry has been requested by counsel. *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995). Although the court has broad discretion to shape the inquiry, it typically may discharge its obligation "by notifying the defendant and the state of the allegations, providing them with an adequate opportunity to respond and stating on the record its reasons for the limited form and scope of the proceedings held." Id., 529. In determining its response, courts should consider the defendant's substantial interest in a fair trial, the risk of deprivation of that constitutional right, and the state's interest in the finality of judgments and protecting the integrity of and maintaining public confidence in the jury system. Id., 530–31. Courts are also urged to "give proper weight to the defendant's response" to the allegations. Id., 530.

We begin our analysis of the present case by addressing the state's contention that the defendant waived this claim by inducing the trial court's failure to take further action regarding the allegedly sleeping juror. In its rectification order, the trial court stated

State *v.* Outlaw

that it withheld judgment "after listening to [defense counsel's] concerns" and concluded that, "*but for* defense counsel's demurral, the court would have considered removing [the sleeping juror] from the jury." (Emphasis in original.) Consequently, the state argues that allowing the defendant to seek reversal on that basis now "would amount to allowing him to induce potentially harmful error, and then ambush the state with that claim on appeal." (Internal quotation marks omitted.) *State* v. *Payne*, supra, 63 Conn. App. 588.

Because the defendant's claim is not limited to the court's failure to remove the allegedly sleeping juror after the in-chambers discussion, we need not address whether a defendant may waive a claim of juror misconduct of this particular nature.[6] In the present case, the defendant argues more broadly that the court should have dismissed *or questioned* the juror. We must decide, therefore, whether the court's entire response to the alleged misconduct gave rise to a constitutional violation, not simply whether one aspect of that response was informed by defense counsel's advocacy. See, e.g., *State* v. *Echols*, 170 Conn. 11, 13, 364 A.2d 225 (1975) (in criminal trials, trial judge is not only "a mere moderator of the proceedings" but also has "responsibility to have the trial conducted in a manner [that] approaches an atmosphere of perfect impartiality" (internal quotation marks omitted)).

Removing the juror is just one remedy that the court could have employed to ensure that the defendant's trial was fair. The court could have questioned the juror

---

[6] Although this court has not yet had occasion to resolve this issue, we note that federal courts have recognized that a defendant can waive a claim of juror misconduct. For a thorough review of how the various federal appellate courts have approached this issue, see *United States* v. *Dean*, 667 F.2d 729, 734 (8th Cir.) (concluding that "appellant, by not bringing the question of juror misconduct to the attention of the trial court before the verdict was returned, thereby waived his right to a new trial"), cert. denied, 456 U.S. 1006, 102 S. Ct. 2296, 73 L. Ed. 2d 1300 (1982).

350 Conn. 251 OCTOBER, 2024 261

State *v.* Outlaw

without immediately excusing him, and the record contains no indication that the defense discouraged the court from doing so or from taking any remedial action short of removal. The fact that defense counsel asked the court not to take the drastic step of dismissing the juror, consequently, does not suggest that the defendant has waived his right to be tried by a jury that was sufficiently attentive during the proceedings to render a fair and informed verdict. We will therefore address the merits of the defendant's claim.[7]

In light of the foregoing, the question before us is whether the defendant has satisfied the third prong of *Golding* by demonstrating that a constitutional violation occurred.[8] Although we acknowledge the inherent difficulty in determining, on the basis of observation alone, whether an individual is sleeping, awake but inattentive, or closing his eyes while listening carefully, we note at the outset that waiting for approximately one hour before addressing the issue of an apparently sleeping juror is not the better practice.[9] The record reveals, however, that the court did not simply abdicate

---

[7] We recognize that, in *State* v. *Payne*, supra, 63 Conn. App. 588, the Appellate Court concluded, under somewhat similar circumstances, that the defendant waived any claim concerning an allegedly sleeping juror. But, although defense counsel in *Payne* asked the trial court not to dismiss the juror, that request occurred only after the court had already questioned the juror at defense counsel's suggestion and after defense counsel had repeatedly asserted that the juror had not been sleeping. Id., 588–89. At that point in the proceedings, there was little else that the court could have done except to implement the one remedy that defense counsel had specifically asked it to forgo. Under those circumstances, the Appellate Court appropriately concluded that the defendant had waived any claim that the court should have excused the juror. See id., 588. We conclude that the present case is distinguishable because the less intrusive remedy of questioning the allegedly sleeping juror was still available to the court.

[8] The state does not dispute that the record is adequate for review or that the claim is of constitutional magnitude.

[9] The fact that the jurors were seated behind plexiglass barriers and wearing masks to guard against the spread of COVID-19 inevitably made the task of monitoring their attentiveness even more challenging. See footnote 4 of this opinion.

State *v.* Outlaw

its responsibility to ensure the integrity of the trial. On the contrary, the court brought the alleged misconduct to the attention of the parties' counsel, solicited their input in chambers, and, on the record, considered the relevant factors, including defense counsel's "[emphatic]" preference for retaining the juror, proposed a plan to monitor the juror, to which the parties agreed, and confirmed, after additional observation, that the juror had not been seen sleeping again. We therefore conclude that the defendant was not deprived of a fair trial.

When the court broached the issue of the inattentive juror with the parties, the discussion that followed elicited inconsistent observations of the juror's behavior. Although the defendant now asserts that "there was no question that the juror was sleeping," at trial, defense counsel first claimed that he had not seen the juror doing so, then acknowledged only that the juror may have been "nodding off." Defense counsel then acceded to the court's plan to continue monitoring the juror without requesting an inquiry that would have established, on the record, that the juror had been asleep for a particular length of time.[10] See, e.g., *State* v. *Collins*, 38 Conn. App. 247, 259, 661 A.2d 612 (1995) (defendant's failure to seek determination of nature and extent of alleged misconduct "seriously undermine[d]" claim that he was deprived of fair trial). The parties' conflicting characterizations of the juror's behavior and defense counsel's desire that the juror remain on the panel further suggest that the alleged misconduct was not so egregious as to compel a more forceful response from the court as a matter of law.

The foregoing considerations necessarily inform our review of the trial court's actions. As we mentioned

---

[10] We do not find persuasive the defendant's assertion that, because the court initially indicated that it was not inclined to act, it would have been futile to request a more extensive investigation. The record makes clear that the court chose that course, in part, because of defense counsel's own concerns.

State *v.* Outlaw

previously in this opinion, in *State* v. *Brown*, supra, 235 Conn. 529–31, this court discussed the factors that should guide a court's response to an allegation of juror misconduct. In that case, we highlighted the importance of protecting a defendant's right to be tried by an impartial jury when fashioning that response. Id., 530. We also acknowledged, however, that "a preliminary inquiry of counsel" may be an adequate response to such allegations. Id., 526. Our holding in *Brown*, therefore, did not require the court in the present case either to remove or to directly question the juror.[11]

The court's inquiry during the in-chambers discussion and ensuing conversation on the record, though limited in scope, was sufficient to satisfy its obligation under *Brown*. The court brought the parties' counsel into chambers, informed them that it appeared the juror had been sleeping, and then solicited their input on how to proceed.[12] When the trial resumed, the court gave both counsel an opportunity to be heard on the record. The court acknowledged that it had discussed the issue with the parties' counsel in chambers and that it would contemplate excusing the juror if he appeared to be sleeping again. Later that afternoon, the court heard from the parties' counsel on the issue again before

[11] Establishing a rule requiring the court to question a juror who is suspected of sleeping or other misconduct may seem like a sensible middle ground between removing the juror and doing nothing. We note, however, that even this apparently innocuous practice may have unintended consequences. See *People* v. *Kuzdzal*, 31 N.Y.3d 478, 486, 105 N.E.3d 328, 80 N.Y.S.3d 189 (2018) ("[u]nnecessarily confronting sworn jurors . . . may impact the impartiality of the jury, and mandating such an intrusive procedure regardless of the particular circumstances of a case may only encourage untoward tactics intended to disrupt the proceedings"). Accordingly, we believe that the better course is to leave the appropriate remedy to the discretion of the trial court, on the basis of the particular circumstances of the case, while emphasizing that trial courts must promptly address the issue of a sleeping juror and either voir dire the juror or make a record of the reasons that it chose not to do so.

[12] Nothing in the record suggests that the court simply deferred to defense counsel or allowed him to unilaterally decide the court's response.

State *v.* Outlaw

explaining its rationale for continuing to monitor, rather than dismiss, the juror. In arriving at its decision, the court contemplated the need to protect the defendant's constitutional rights, the logistical implications of removing the juror, and defense counsel's concern related to the racial composition of the jury, which should not be taken lightly.

Issues of race are complex in our society. They are equally so in this case, in which the record allows for the perception that a possibly sleeping juror was allowed to stay on the jury because he was the only Black person on the panel. As this court has previously observed, there is "great constitutional value in having diverse juries," and research indicates that diverse juries are "significantly more able to assess reliability and credibility, avoid presumptions of guilt, and fairly judge a criminally accused." (Internal quotation marks omitted.) *State* v. *Holmes*, 334 Conn. 202, 235, 221 A.3d 407 (2019). The defense's aversion to removing—in the court's recollection—the lone Black juror, after the parties had completed voir dire and accepted the panel, was well-founded and worthy of the court's consideration. We emphasize, however, that concerns about jury diversity, though laudable, must be secondary to ensuring that all empaneled jurors are up to performing the task before them. Contemporary to the trial in this case, and following the work of the post-*Holmes* Jury Selection Task Force, Connecticut undertook numerous legislative and rule changes to the process by which juries are selected. These changes (1) ensure that the pool from which jurors are summoned reflects the diversity of the judicial district in which each case is tried, and (2) limit the use of reasons that are race neutral on their face but have a disparate impact on minority jurors to sustain the exercise of peremptory challenges to minority jurors. See generally Jury Selection Task Force, Report of the Jury Selection Task Force to Chief

State *v.* Outlaw

Justice Richard A. Robinson (December 31, 2020), available at https://www.jud.ct.gov/Committees/jury taskforce/ReportJurySelectionTaskForce.pdf (last visited August 2, 2024). We are hopeful that these changes will have the effect of broadening jury pools in a way that assures trial courts that a defendant will receive a trial before a panel of attentive jurors competent to perform the serious task at hand, while also maintaining a jury panel that reflects the racial composition of the judicial district from which it is chosen.[13]

In the present case, the court was indeed mindful of the problems posed by a juror who could not stay awake, noting that "a sleeping juror obviously has not heard all the evidence and that inattentiveness could compromise the defendant's guaranteed right to a jury trial." Furthermore, the court's inquiry did not end there. The record reflects that the court did monitor the juror on the next day of trial and subsequently observed that "there ha[d] not been a reoccurrence of the situation . . . ." Neither defense counsel nor the prosecutor commented or requested that the court take any further action.

The defendant nonetheless urges this court to adopt the position that a conviction must be reversed in any case in which one or more of the jurors was sleeping. In making this argument, he draws heavily on the Massachusetts Supreme Judicial Court's reasoning in *Commonwealth* v. *McGhee*, supra, 470 Mass. 642–46, a case that the concurring and dissenting opinion also finds "particularly persuasive." In *McGhee*, the court con-

_____

[13] We would also be well advised to remember that the task of concentrating on often complex testimony, occasionally in aged buildings with climate control of questionable efficacy, is physically and mentally demanding. This is especially so, given some of the COVID-19 mitigation measures that were in place during this trial. See footnote 4 of this opinion. Trial judges should not hesitate to schedule testimony in a way that allows for sufficient breaks for stretching, movement, and hydration sufficient to allow jurors to maintain their attention on the proceedings.

State *v.* Outlaw

cluded that "[t]he serious possibility that a juror was asleep for a significant portion of the trial is [a] structural error . . . that so infringes on a defendant's right to the basic components of a fair trial that it can never be considered harmless . . . ." (Internal quotation marks omitted.) Id., 645–46. That case, however, is readily distinguishable. The juror in *McGhee* was alleged to have slept through nearly an entire day of evidence, including testimony from two victims, and multiple jurors reported that he had been snoring loudly and unmistakably. Id., 645. Perhaps even more significant, both the prosecutor and defense counsel asked the court to question the juror, and the court declined to do so because it had not personally observed him sleeping. Id., 643. In the present case, on the other hand, it was the trial court that first raised the issue and reasonably concluded, after a discussion with the parties' counsel, that a more detailed inquiry was not necessary at that time. On the basis of this record, we cannot simply presume on appeal that the juror was unfit to participate in deliberations.[14]

We also emphasize that, despite the defendant's argument to the contrary, continued observation is not nec-

---

[14] Contrary to the dissent's view, our conclusion that no constitutional violation occurred in the present case is not grounded in the court's failure to make a finding on the record that the juror was, in fact, sleeping but, rather, in the sufficiency of the court's response. That response included bringing the juror's behavior to the attention of the parties' counsel sua sponte, discussing the issue with them in chambers and on the record, weighing the need to protect the defendant's constitutional rights and defense counsel's concern related to the racial composition of the jury, and continuing to monitor the juror. Given those circumstances, we conclude that there was no constitutional violation, particularly not an error that rendered the trial so fundamentally unfair as to require reversal and a new trial. See, e.g., *State* v. *Latour*, 276 Conn. 399, 410, 886 A.2d 404 (2005) ("Structural [error] cases defy analysis by harmless error standards because the entire conduct of the trial, from beginning to end, is obviously affected . . . . These cases contain a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." (Internal quotation marks omitted.)).

State *v.* Outlaw

essarily an inadequate response to a concern that a juror may have been sleeping. For example, the United States Court of Appeals for the Second Circuit previously determined that the District Court did not abuse its discretion when, after the defendants claimed that one of the jurors had slept through most of the testimony, the court investigated the allegation and chose to carefully observe the juror, rather than to excuse him. *United States* v. *Diaz*, 176 F.3d 52, 78 (2d Cir.), cert. denied sub nom. *Rivera* v. *United States*, 528 U.S. 875, 120 S. Ct. 181, 145 L. Ed. 2d 153 (1999), and cert. denied sub nom. *Millet* v. *United States*, 528 U.S. 875, 120 S. Ct. 314, 145 L. Ed. 2d 153 (1999), and cert. denied sub nom. *Cruz* v. *United States*, 528 U.S. 875, 120 S. Ct. 315, 145 L. Ed. 2d 153 (1999), and cert. denied sub nom. *Morales* v. *United States*, 528 U.S. 875, 120 S. Ct. 315, 145 L. Ed. 2d 153 (1999), and cert. denied sub nom. *Vidro* v. *United States*, 528 U.S. 875, 120 S. Ct. 315, 145 L. Ed. 2d 153 (1999), and cert. denied sub nom. *Roman* v. *United States*, 528 U.S. 957, 120 S. Ct. 386, 145 L. Ed. 2d 301 (1999).

Similarly, in *United States* v. *Freitag*, 230 F.3d 1019 (7th Cir. 2000), the United States Court of Appeals for the Seventh Circuit concluded that there was no abuse of discretion when the District Court, upon being informed by defense counsel late in the trial that a juror apparently had been sleeping earlier in the week, declined to conduct an inquiry as to what the juror may have missed and, instead, directed both counsel to alert the court to any further episodes. Id., 1023. Although the severity of the inattentive juror's behavior in each of these cases varies, the common thread is that keeping a close eye on a juror who is struggling to stay awake— and perhaps asking counsel to do the same—may be a sufficient course of action under the circumstances of the case. Some courts have, indeed, adopted a stricter rule that leaves little room for discretion. See, e.g., *Peo-*

State *v.* Outlaw

*ple* v. *Simpkins*, 16 App. Div. 3d 601, 601, 792 N.Y.S.2d 170 ("[a] juror who has not heard all the evidence in the case is grossly unqualified to render a verdict"), appeal denied, 5 N.Y.3d 769, 834 N.E.2d 1273, 801 N.Y.S.2d 263 (2005). We are persuaded, however, that the foregoing reasoning reflects an appropriate degree of concern for the integrity of the proceedings and awareness of the trial court's "unique position to ascertain an appropriate remedy . . . ." *United States* v. *Peterson*, 385 F.3d 127, 134 (2d Cir. 2004). In the present case, we likewise conclude that the court, by adopting this measured response, satisfied its mandate to "weigh the relevant factors and determine the proper balance between them." *State* v. *Brown*, supra, 235 Conn. 532.

Because, under these circumstances, the trial court's inquiry adequately addressed the alleged misconduct, the defendant is unable to establish the existence of a constitutional violation, as required under the third prong of *Golding*. In light of that conclusion, a separate review for plain error is unnecessary. See, e.g., *State* v. *Silva*, 339 Conn. 598, 615 n.11, 262 A.3d 113 (2021) (claim of plain error fails when claim fails under third prong of *Golding*).

II

Next, we address the defendant's claim that the trial court improperly allowed the prosecutor to elicit on direct examination and to discuss in his closing argument the fact that two witnesses—Martin and Rivera—had requested witness protection. Defense counsel did not object to that testimony or to the prosecutor's mention of the witness protection program during closing argument. The defendant nonetheless argues on appeal that the references to witness protection were not relevant and were sufficiently prejudicial to warrant reversal of his conviction.

State *v.* Outlaw

Because this issue is unpreserved, the defendant seeks review pursuant to the plain error doctrine. A court reviewing for plain error applies a two step analysis: the defendant must establish that (1) there was "an obvious and readily discernible error," and (2) the error "was so harmful or prejudicial that it resulted in manifest injustice." (Internal quotation marks omitted.) *State* v. *Blaine*, supra, 334 Conn. 306. "[I]t is not enough for the defendant simply to demonstrate that his position is correct." *State* v. *Coward*, 292 Conn. 296, 307, 972 A.2d 691 (2009). Rather, plain error review is "an extraordinary remedy" for errors "that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice . . . ." (Internal quotation marks omitted.) *State* v. *Blaine*, supra, 305.

We addressed the admissibility of evidence related to a witness' participation in witness protection in *State* v. *Bermudez*, 341 Conn. 233, 257, 267 A.3d 44 (2021). In that case, we made clear that "admitting evidence of a testifying witness' placement in a witness protection program must be handled delicately." (Internal quotation marks omitted.) Id. In that case, the state's key witness had waited for twelve years before implicating her estranged husband and his two brothers in a robbery and murder, having previously corroborated the false alibi that they had devised. Id., 237–38. Her testimony was described by this court as "the linchpin of the state's case," and there was "no question" that the reason for her delay in coming forward would be "the central focus of the defense's attack . . . ." Id., 259. At trial, the witness testified during direct examination that she had been afraid to refute the false alibi because she feared retaliation from her husband, who had abused her for years, and from the gang affiliates of her husband's brother.[15] Id., 241–42. Notably, she also

---

[15] The defendant in *State* v. *Bermudez*, supra, 341 Conn. 237, was not the witness' estranged husband but one of his brothers, who was tried separately. See *State* v. *Santiago*, 187 Conn. App. 350, 202 A.3d 405, cert. denied, 331 Conn. 902, 201 A.3d 403 (2019).

State *v.* Outlaw

testified that she and her children were relocated by the state after she provided her statement and that she still had not returned to her home.[16] Id., 255–56. When the defendant claimed on appeal that the trial court had abused its discretion by admitting evidence that the witness had been relocated, this court upheld the trial court's ruling, stating: "Because the trial court knew in advance that [the witness'] purported fear of and need for protection from the defendant and his brothers would be a central focus of the trial and that the defense would argue that [the witness] was lying when she claimed that fear had prevented her from coming forward sooner, we cannot conclude that it was an abuse of that court's wide discretion to allow [the witness] to testify, on direct examination, that she was relocated by the state immediately after giving her statement to the police due to fear of reprisals from the defendant and his brothers." Id., 260.

*Bermudez*, however, does not give prosecutors a free hand to introduce the topic of witness protection any time a witness' credibility is at issue. Even though we upheld the Appellate Court's affirmance of the judgment of conviction, we described that case as the "rare instance" in which it was appropriate for the prosecutor to introduce evidence of a witness' participation in a witness protection program on direct examination, and we cautioned that such evidence "implies to the jury that the witness needed protection from the defendant and tends to bolster the witness' credibility by raising the inference that [her] testimony must be truthful . . . ." Id., 257–59. To that end, we concluded that, "as a general matter . . . the state should not elicit testimony from a witness regarding the witness' participa-

---

[16] Although the trial court allowed the prosecutor to elicit details pertaining to the witness' relocation, it did not allow the prosecutor or the witness to use the phrase "witness protection program . . . ." (Internal quotation marks omitted.) *State* v. *Bermudez*, supra, 341 Conn. 255. This precaution was not taken in the present case.

State *v.* Outlaw

tion . . . on direct examination but, rather, should wait until redirect examination to do so, and then only if the defense's cross-examination of the witness opened the door to such testimony." Id., 258. Although we noted that, under some circumstances, prosecutors may do so "in anticipation of a defense attack [on] the witnesses' credibility"; (internal quotation marks omitted) id.; we emphasized that the witness' participation in the program must be directly relevant to answering that anticipated challenge, and that the prosecutor may not exploit this evidence or present it in such a way that suggests the witness required protection because of threats made by the defendant. See id., 258–60; see also *United States* v. *Deitz*, 577 F.3d 672, 689 (6th Cir. 2009) (prosecutor should not refer to witness protection program unless need for protection is "obvious, relevant, [or] made an issue by defense counsel" (internal quotation marks omitted)), cert. denied, 559 U.S. 984, 130 S. Ct. 1720, 176 L. Ed. 2d 201 (2010); *United States* v. *Melia*, 691 F.2d 672, 675 (4th Cir. 1982) (evidence of participation in witness protection program "could easily lead a jury to believe that the defendant is the source of threats" and "should therefore be presented with great caution").

We conclude that, although the court improperly allowed Martin and Rivera to testify about their participation in witness protection, the defendant has not demonstrated that doing so resulted in a manifest injustice requiring reversal. Because there are substantive differences in the witnesses' cooperation agreements, the witnesses' relationship to the events at issue in this appeal, and the way that the relevant evidence was presented, we will address their circumstances separately.

A

Before Martin testified, defense counsel objected to the prosecutor's introduction of Martin's cooperation

State *v.* Outlaw

agreement into evidence. Defense counsel's objection was based on the agreement's "truthfulness language," which, he argued, "essentially . . . has the prosecutor vouching for the truth of the witness before she testifies . . . ." Defense counsel requested in the alternative that, if the trial court deemed the cooperation agreement admissible, it provide a limiting instruction on that portion of the agreement or redact it altogether. Defense counsel made no mention of the language in the agreement providing that, in exchange for Martin's truthful testimony at the defendant's trial, the state would "make reasonable efforts" to enroll her in the witness protection program and to afford her benefits accordingly. The court overruled the objection.[17]

When the prosecutor introduced the cooperation agreement during direct examination, Martin testified that she was in witness protection and that the state was providing her with room and board, as well as money for expenses. The prosecutor also introduced two memoranda that detailed Martin's witness protection expenditures to date and discussed additional assistance that she had been offered for her "permanent relocation . . . ."[18] These memoranda included no

_____

[17] The court instructed the jury on the cooperation agreements in relevant part: "[N]otwithstanding any language contained in the cooperation agreement signed by . . . Rivera and . . . Martin, it is your exclusive role to determine the credibility and believability of those witnesses. In other words, you and you alone are to determine whether any evidence offered by . . . Rivera and . . . Martin is to be believed wholly, partly, or not at all, irrespective of any language in the cooperation agreement that may suggest otherwise."

[18] Martin signed her agreement on February 16, 2022, the same day that she testified. Defense counsel noted that an unsigned copy was given to him that morning but made no further comment about the timing. It is unclear from the record, therefore, to what extent the defense was familiar with the agreement and how it would be used at trial. Although the agreement provides that the state *would* make reasonable efforts to enroll Martin in the program, the memoranda indicate that she had already received approximately $2500 in benefits and had been offered additional funding to assist in her relocation from the area. Because we assume that these payments were made in compliance with the statutory requirements outlined in General Statutes §§ 54-82t and 54-82u, it appears that the status of the

State *v.* Outlaw

fewer than ten instances of the phrase "witness protection." Defense counsel did not object to Martin's testimony or to the admission of the memoranda.

On cross-examination, defense counsel did not question Martin about her witness protection arrangement, concentrating instead on her criminal history and history of drug use. During his closing argument, defense counsel noted that Martin had "been getting money all along" and suggested that she had a motive to "come in here and tell you whatever she thinks the state wants to hear." During the prosecutor's rebuttal closing argument, he commented that Martin's testimony had been corroborated and added: "Do you think she was scared? She's in witness protection now." The court instructed the jury that Martin had been "eligible for certain financial and other benefits in connection with her testimony in this case," and that the jury could infer that she had a motive to inculpate the defendant. Defense counsel did not request, and the court did not give, a limiting instruction that the evidence related to witness protection could be used only to assess Martin's credibility.

We are not persuaded that the present case represents the "rare instance" identified in *State* v. *Bermudez*, supra, 341 Conn. 259, in which it would have been appropriate for the prosecutor to elicit testimony on direct examination about Martin's participation in witness protection, as outlined in her cooperation agreement, or to introduce the memoranda outlining the benefits that she received through that program. Although the state makes a cursory suggestion in its brief to this court that Martin had "reservations" about identifying the defendant, this theory is undermined by her own testimony. Unlike in *State* v. *Bermudez*, supra, 246, in which it was all but certain that the defense

state's arrangement with Martin was not accurately reflected in the February 16, 2022 agreement.

State *v.* Outlaw

would use the witness' twelve year delay in reporting the crime to suggest that she was not reliable and would challenge her claim that her fear prevented her from coming forward sooner, in the present case, Martin had not hesitated to cooperate with law enforcement; in fact, she told the police that she had seen the defendant in Rivera's rental car on the night of the shooting when she was interviewed about one month later. There is also no claim that Martin unexpectedly changed her story in a way that could only be explained by her sudden entry into a protection program, or that the prosecutor and the trial court knew in advance of her testimony that the defense intended to challenge her credibility during cross-examination on the ground that she was receiving protection from the state.

The state argues that Martin's testimony was necessary because the defense would inevitably have used her participation in witness protection to impeach her credibility. Defense counsel, however, never cross-examined Martin about the payments she received or her reason for entering the program, and there was no suggestion before Martin testified that he would do so. Although defense counsel vigorously attacked Martin's credibility on cross-examination, his questions focused on her lengthy criminal history, her extensive drug use, and the inconsistencies between her trial testimony and the statements that she had made to the police. Martin's relocation had no apparent bearing on any of these issues, and it was only in his closing argument that defense counsel mentioned the financial benefits that Martin received in return for her testimony.

On this record, we find no support for the state's assertion that the defense inevitably would have made strategic use of Martin's participation in the witness protection program to impeach Martin's credibility. We made clear in *Bermudez* that evidence of a witness' participation in witness protection should be admitted

State *v.* Outlaw

with great caution and that prosecutors generally should not elicit that evidence on direct examination, unless there is no question that the defense would use it to impeach the witness or that eliciting such evidence is necessary to counter an argument from the defense about the witness' credibility. Id., 258. Under these circumstances, we conclude that it was an obvious, readily discernible error to allow the prosecutor to proactively present evidence that Martin was in the witness protection program during his direct examination.

These significant concerns notwithstanding, we are unable to conclude that the defendant met his burden of demonstrating that a manifest injustice resulted from the admission of this evidence. The concern underlying the practice of not allowing a jury to hear that a witness is receiving protection is that doing so may suggest that the witness must be kept safe from the defendant. Neither Martin nor the prosecutor, however, stated that the defendant had ever threatened Martin or that she was seeking protection from him.[19] See, e.g., id., 263 (noting that evidence had not been presented in way that suggested witness was in witness protection because of threats by defendant); see also *United States* v. *Vastola*, 899 F.2d 211, 236 (3d Cir.) (recommending that courts assessing prejudicial impact of witness protection testimony consider whether it "specifically inculpates the defendant as the source of threats to the witness"), vacated on other grounds, 497 U.S. 1001, 110 S. Ct. 3233, 111 L. Ed. 2d 744 (1990). We agree that "the potential for prejudice is slight [when the witness protection] testimony only vaguely suggests that the witness was placed in the program because of threats

_____

[19] When Martin was asked on redirect examination why she needed protection, she testified that she was familiar with the defendant's gang affiliation and "definitely" thought that "something would happen" to her if she encountered someone with the same affiliation after testifying. Defense counsel objected to the prosecutor's questioning, and the court struck the exchange from the record.

State *v.* Outlaw

emanating from the defendant,'' as in the present case. *United States* v. *Vastola*, supra, 236.

We also note that the prosecutor did not exploit the evidence at issue. Unlike other cases in which the prosecutor elicited ''dramatic'' and ''excessive'' testimony about witness protection from multiple witnesses; *United States* v. *Melia*, supra, 691 F.2d 676; the prosecutor's questioning of Martin on that topic was brief. The prosecutor did not mention the expenditure memoranda again after establishing that they documented Martin's benefits, and he referenced her protection arrangement only once in his rebuttal closing argument. Martin's credibility, moreover, had already been called into question on other grounds. Martin admitted that she had been under the influence of drugs on the night of the incident, which affected her ability both to observe and to remember what had taken place, and that she had also been ''high'' the first time she spoke to the police. Martin also acknowledged on the stand that other statements she made about the shooting were ''probably confusing'' and likely inaccurate. Consequently, it is doubtful that the fact that Martin received relocation assistance from the state would have been determinative in assessing her reliability as a witness. Moreover, although Martin's testimony that the defendant was in Rivera's rental car that evening was corroborated by other witnesses and was consistent with the physical evidence, she did not witness the shooting itself. Given these circumstances, the defendant failed to meet his burden of proving that allowing the evidence of Martin's participation in the witness protection program resulted in a manifest injustice.[20]

[20] Although the defendant argues that the court should have instructed the jury that it could not use this evidence to demonstrate propensity or character, defense counsel did not request such an instruction. We have previously acknowledged, however, that the ''best course'' is to give a limiting instruction when admitting such evidence to reduce the potential prejudice to the defendant. *State* v. *Bermudez*, supra, 341 Conn. 262 n.17.

State *v.* Outlaw

B

Rivera, who was incarcerated at the time of trial on charges related to the victim's murder, was the state's final witness. Rivera also testified pursuant to a cooperation agreement, although hers did not include any reference to witness protection. On direct examination, however, Rivera testified that, "in addition to" her agreement, the state agreed to provide protection to her family.[21] She later testified that the defendant, in reference to the shooting, told her that "he would do the same thing to [her]" if she said anything. Defense counsel cross-examined Rivera about the terms of her cooperation agreement but did not question her about the protection her family was purportedly receiving. During closing argument, the prosecutor referenced Rivera's testimony that the defendant had threatened to kill her if she told anyone what he had done, and indicated that this explained her unwillingness to testify for more than one year after the murder: "[W]hen would you feel safe to testify? When you're locked up, when you feel no one could get to you, or when your family is offered witness protection." During his closing argument, defense counsel suggested that Rivera was not credible because she did not cooperate until the state offered her a plea deal. In response, the prosecutor again brought up the defendant's alleged threat in his rebuttal argument: "Now, she didn't come forward for eighteen months or so . . . Why? Because she saw her boyfriend murder someone in a parking lot. . . . Do you think she was in fear of her own physical safety? She requested that her family be placed in witness protection." The court instructed the jury that Rivera and her family could benefit from her testimony and that

---

[21] It is unclear from the record when these protective services were offered to Rivera's family members, whether the protection was given in return for Rivera's testimony at trial, and whether those arrangements were formalized in a written agreement, as required by General Statutes § 54-82u (a).

State *v.* Outlaw

the jury could infer that she had a motive to inculpate the defendant, although no instruction on criminal propensity was given.

We are not persuaded that it was necessary for the prosecutor to elicit, during Rivera's direct examination, that Rivera had asked for her family to be placed in witness protection. Rivera's supposed delay in coming forward was not a central issue in the trial, as was the case in *State* v. *Bermudez*, supra, 341 Conn. 260. It was reasonable to anticipate that the defense would challenge Rivera's credibility on the grounds that she was a coconspirator to the murder and that she stood to benefit from testifying against him. Indeed, defense counsel's cross-examination focused heavily on Rivera's cooperation agreement and the various incentives that she had to identify the defendant as the perpetrator, including a reduction in charges and the right to argue for a lesser sentence. There is nothing in the record, however, to suggest that the prosecutor knew in advance that the defense would attack Rivera's credibility because of the benefit given to her family in the form of witness protection, and the record reveals that such an attack never materialized. The prosecutor suggested in his closing argument that Rivera's reluctance to cooperate with law enforcement was tied to her concern for her family's safety. On cross-examination, however, Rivera testified that she had spoken with the police about the shooting *before* entering into any agreements with the state. Accordingly, allowing Rivera to testify that her family was participating in witness protection, before defense counsel could have opened the door to such testimony on cross-examination, was an obvious, readily discernible error.

Again, however, we have no basis to conclude that allowing this testimony resulted in a manifest injustice. Unlike Martin, who never suggested that she specifically feared the defendant, Rivera testified without

350 Conn. 251 OCTOBER, 2024 279

State *v.* Outlaw

objection that she had watched the defendant shoot and kill a rival gang member and that he had threatened to kill her if she said anything about the murder. As a result, the jury was already aware that Rivera believed that the defendant was dangerous. We note as well that other evidence placing the defendant at the scene of the shooting was entirely consistent with Rivera's testimony to that effect. Multiple witnesses testified that they had seen the defendant in the passenger seat of Rivera's rental car that night. Video surveillance footage from the hotel parking lot captured a man matching the defendant's description exiting the passenger side door of that car and dropping what was later determined to be a Taco Bell wrapper onto the ground. Cell site location data placed Rivera at a nearby Taco Bell shortly before she and the defendant arrived at the hotel, and the defendant's DNA was detected on the wrapper. Given the strength of the evidence pointing to his guilt and the evidence detailing his threats to the witness, the defendant has failed to meet the high bar of proving that the admission of Rivera's testimony related to her family's participation in the witness protection program meaningfully altered the course of the trial. The admission of this evidence, therefore, did not result in a manifest injustice that compels reversal.

In sum, the facts of the present case do not represent one of the "rare instance[s]" in which, under *State* v. *Bermudez*, supra, 341 Conn. 259, it would have been permissible for the prosecutor to elicit testimony on direct examination about a witness' involvement in witness protection. The reasons why a jury might have been expected to doubt the credibility of these witnesses had little to do with their participation in witness protection, and those concerns were unlikely to have been mitigated by a discussion of those facts. Although we outlined in *Bermudez* that evidence related to witness protection warrants caution and sensitivity, that

State *v.* Outlaw

guidance was not followed in the present case. Id., 258. There was an obvious, discernible error. Because a manifest injustice did not result, however, we will not overturn the defendant's conviction on this ground. See, e.g., *State* v. *Hinckley*, 198 Conn. 77, 87–88, 502 A.2d 388 (1985) (reversal under plain error doctrine is reserved for errors that "[affect] the fairness and integrity of and public confidence in the judicial proceedings").

III

We turn next to the defendant's claim that the trial court abused its discretion by admitting evidence that Rivera had pleaded guilty to, inter alia, conspiracy to commit murder. At the time of the defendant's trial, Rivera faced a maximum sentence of fifteen years of incarceration with the right to argue for less time in exchange for her cooperation. The defendant filed a motion in limine requesting that Rivera be prohibited from identifying the charges to which she pleaded guilty related to the victim's murder. At oral argument on the motion, the prosecutor opposed any limitation on the admissibility of Rivera's cooperation agreement. The court denied the motion, referring to its earlier ruling on the admissibility of Martin's cooperation agreement and stating that its instruction on such agreements would sufficiently balance the concerns of all parties. When Rivera testified, her cooperation agreement was admitted as a full exhibit over defense counsel's objection, and its terms were displayed on a screen and read aloud. Rivera acknowledged that she had pleaded guilty to conspiracy to commit murder and to hindering prosecution in the first degree. During the prosecutor's closing argument, he referred to Rivera as a coconspirator, reminded the jury that she had pleaded guilty to conspiracy to commit murder, and suggested that she was "in a unique position" to describe the details of the murder. The court instructed the jury that it "must not consider

State *v.* Outlaw

. . . Rivera's guilty plea to an offense connected to the crimes charged here as any evidence of the defendant's guilt'' and that ''[t]he fact that Rivera has entered a plea of guilty is not evidence of the guilt of any other person.''

The defendant contends that the names of the crimes were more prejudicial than probative and that the court effectively allowed Rivera to tell the jury that she and the defendant had agreed to commit murder. Although the defendant acknowledges the need for transparency with respect to cooperation agreements, he argues that this interest would have been satisfied if Rivera simply testified that she had pleaded guilty to *some* offense related to this case and that she was testifying pursuant to a cooperation agreement. In response, the state contends that excluding any part of Rivera's cooperation agreement may have interfered with the jury's ability to assess her credibility and that the court's instruction was sufficient to mitigate any concerns over the prejudicial impact of that evidence.[22] Because we conclude that there was no harm in the admission of evidence concerning the specific crimes to which Rivera pleaded guilty, we need not decide whether it constituted an abuse of the court's discretion.

[22] Although the Connecticut Division of Criminal Justice's policies correctly underscore that cooperation agreements generally should be reduced to writing, signed by the witness, disclosed to the defense, and made part of the trial record; see Division of Criminal Justice, Connecticut Prosecution Standards (1st Ed. 2023) § 2-10.9, p. 78, available at https://portal.ct.gov/-/media/DCJ/07202023DCJ-CT-Prosecution-Standards.pdf. (last visited August 5, 2024); we emphasize that not every aspect of a written cooperation agreement is, per se, admissible. See, e.g., *State* v. *Flores*, 344 Conn. 713, 736, 281 A.3d 420 (2022) (''the state must take care in drafting its cooperation agreements, and trial courts must carefully examine their language before admitting them fully into evidence''). In determining admissibility, a trial court should review the agreement in its entirety to determine if the probative value of each provision outweighs the danger of unfair prejudice and require the state to redact any unfairly prejudicial material. See Conn. Code Evid. § 4-3; see also, e.g., *State* v. *Calhoun*, 346 Conn. 288, 301, 289 A.3d 584 (2023) (recognizing that probative value of gratuitous references to witness' obligation under agreement to tell truth are ''negligible and outweighed by their prejudicial effect'').

State *v.* Outlaw

It is well established that "the guilty plea of one or more persons jointly charged with a crime cannot be admitted in the trial of another so charged to establish that the crime was committed." (Internal quotation marks omitted.) *State* v. *Just*, 185 Conn. 339, 348, 441 A.2d 98 (1981). As this court has previously acknowledged, such a plea is "merely a confession of guilt [that], having been made by one of those charged with the crime, can be no more than hearsay as to another who is so charged." *State* v. *Pikul*, 150 Conn. 195, 198, 187 A.2d 442 (1962). A witness' guilty plea is generally admissible, however, when it is offered to affect the credibility of the testifying codefendant or coconspirator. *State* v. *Just*, supra, 348; see also *State* v. *Butler*, 55 Conn. App. 502, 511, 739 A.2d 732 (1999) ("guilty pleas and convictions may be introduced into evidence if the [coconspirator] or [codefendant] testifies at trial, so that the [fact finder] will have appropriate facts on hand to assess the [witness'] credibility" (internal quotation marks omitted)), aff'd, 255 Conn. 828, 769 A.2d 697 (2001). We have also previously advised that, when a plea is admitted under these circumstances, "a proper cautionary instruction to the jury should be given, generally upon [an] objection [that has been] overruled or sua sponte [when] the court views the potential for prejudice as likely."[23] *State* v. *Just*, supra, 348.

Courts in other jurisdictions have discussed the risks of allowing testimony naming the crime to which a coconspirator witness pleaded guilty, while generally

[23] The United States Court of Appeals for the Second Circuit and other federal appellate courts have made the same recommendation. See, e.g., *United States* v. *Prawl*, 168 F.3d 622, 626 (2d Cir. 1999) (district courts "should instruct the jury that the [codefendant's] plea may not be considered as evidence of the defendant's guilt"). Even the lack of such an instruction, however, does not necessarily constitute harmful error, and it is just one factor in a reviewing court's determination of whether a defendant has been unfairly prejudiced. In *Just*, this court suggested that the failure to give the instruction is more problematic if the defense had requested one or had objected to the testimony. *State* v. *Just*, supra, 185 Conn. 348–49.

State *v.* Outlaw

concluding that such evidence may be admitted for certain limited purposes. Admission of a "guilty plea to a conspiracy charge carries with it more potential harm to the defendant on trial because the crime by definition requires the participation of another." *United States* v. *Gullo*, 502 F.2d 759, 761 (3d Cir. 1974). As the United States Court of Appeals for the Third Circuit has previously observed, a "jury could not fail to appreciate the significance of this and would realize . . . that 'it takes two to tango.' " (Citation omitted.) Id. Those concerns notwithstanding, "[w]hen a [coconspirator] testifies [that] he took part in the crime with which the defendant is charged, his credibility will automatically be implicated." (Internal quotation marks omitted.) *United States* v. *Universal Rehabilitation Services (PA), Inc.*, 205 F.3d 657, 666 (3d Cir. 2000).

The question that is ultimately before this court is whether the admission of this evidence, even if we were to assume it was improper, was harmful. "[W]hen an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends [on] a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a

State *v.* Outlaw

fair assurance that the error did not substantially affect
the verdict.'' (Internal quotation marks omitted.) *State*
v. *Holley*, 327 Conn. 576, 616–17, 175 A.3d 514 (2018).

For several reasons, we conclude that the evidence
specifying the crimes to which Rivera pleaded guilty
did not substantially impact the jury's verdict. Most
significant, the prosecutor did not offer this evidence
to prove that the defendant committed the crimes for
which he was being tried. Indeed, the court clearly
instructed the jury that it was *not* to consider Rivera's
plea as evidence of the defendant's guilt. See, e.g.,
*United States* v. *El-Battouty*, 38 F.4th 327, 330 (3d Cir.
2022) (suggesting that any prejudicial effect is typically
cured by instructing jury that it may not use guilty plea
of cooperating witness as evidence that defendant is
guilty). In the absence of an indication to the contrary,
a jury is presumed to have followed the court's instruc-
tions. *State* v. *Hughes*, supra, 341 Conn. 429. The instruc-
tion given by the court was consistent with our guidance
in *Just* and effectively addressed defense counsel's con-
cern that the jury would infer the defendant's guilt from
Rivera's testimony.

The fact that the jury heard the details of Rivera's
guilty plea, moreover, does not change the fact that she
admitted that she had been present at the time of the
crime and had participated in its commission. As the
defendant acknowledges, Rivera was the state's key
witness and described her own role in the incident in
detail. She testified, subject to cross-examination, that
she had driven the car from which the fatal shots were
fired, that she had put the defendant on notice that a
rival gang member was in the parking lot, and that
the defendant was the shooter. See *United States* v.
*Lombardo*, 582 Fed. Appx. 601, 615 (6th Cir. 2014)
(''[e]ven though a [coconspirator's] guilty plea can be
especially prejudicial if it is introduced in connection
with the conspiracy for which the defendant is charged,

State *v.* Outlaw

much of the potential for prejudice is negated when the [coconspirator] testifies about the underlying facts''), cert. denied sub nom. *Barkus* v. *United States*, 574 U.S. 1095, 135 S. Ct. 992, 190 L. Ed. 2d 870 (2015), and cert. denied, 574 U.S. 1173, 135 S. Ct. 1442, 191 L. Ed. 2d 397 (2015). As we noted previously in this opinion, Rivera's testimony was corroborated by other witnesses as well as video surveillance footage and physical evidence that placed her and the defendant at the scene. See part II B of this opinion. To the extent that the jury credited Rivera's testimony, they likely did so because that testimony was based on her firsthand knowledge of the events and was consistent with the other evidence, not because it had been told that she had pleaded guilty to the conspiracy charge.

The prosecutor, moreover, did not unduly emphasize Rivera's guilty plea in his closing argument. Although the prosecutor twice referred to Rivera as a ''coconspirator,'' he did so only to highlight that her involvement in the crime made her testimony more credible, and defense counsel later used that same term when he questioned the veracity of her testimony. See, e.g., *State* v. *Ayala*, 333 Conn. 225, 235, 215 A.3d 116 (2019) (manner in which state used evidence in its closing argument is significant when evaluating harm); cf., e.g., *State* v. *Culbreath*, 340 Conn. 167, 195, 263 A.3d 350 (2021) (error was not harmless when prosecutor repeatedly drew jury's attention to defendant's inadmissible statements, arguing that they reflected his guilt). Finally, the defendant's theory was that he was not the passenger in Rivera's rental car, not that there had been no conspiracy between Rivera and her passenger. Whether such a conspiracy existed was not a central issue at trial. Although the defendant was charged with conspiracy to commit murder at the time the court allowed the prosecutor to introduce the names of the crimes to which Rivera pleaded guilty, the court subsequently

State *v.* Outlaw

granted a judgment of acquittal on that count. Accordingly, the jury was never asked to decide whether the defendant had, in fact, conspired with Rivera to commit the murder. We are therefore confident, on the basis of this record, that the admission of this evidence did not substantially sway the jury's verdict.

IV

Finally, we address the defendant's claim that the prosecutor's remark in his closing argument that Rivera took responsibility for her actions by pleading guilty violated his right to a jury trial. During closing argument, the prosecutor made the following comment: "And [Rivera] did tell you her role in this case. She also told you she pled guilty to conspiracy. She took responsibility for her actions with regards to this case."[24] Defense counsel did not object or ask that the court take remedial action. On appeal, however, the defendant argues that, by highlighting the fact that Rivera pleaded guilty, the prosecutor improperly suggested that the defendant, her alleged coconspirator, should have done the same thing because he, too, was guilty. We disagree.

The right of a criminal defendant to a jury trial is enshrined in both the federal and state constitutions; U.S. Const., amend. VI; Conn. Const., art. I, § 19; and it is also guaranteed by statute. General Statutes § 54-82b.

---

[24] During trial, the prosecutor represented outside the jury's presence that Rivera pleaded guilty under the *Alford* doctrine. See *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). As such, Rivera did not admit her guilt, but she acknowledged that "the state's evidence against [her was] so strong that [she was] prepared to accept the entry of a guilty plea nevertheless." (Internal quotation marks omitted.) *State* v. *Pentland*, 296 Conn. 305, 308 n.3, 994 A.2d 147 (2010). The defendant in the present case has not relied on the nature of Rivera's guilty plea to challenge the prosecutor's comment that Rivera "took responsibility" through it. We note that, by entering an *Alford* plea, "a defendant may be able to avoid formally admitting guilt at the time of sentencing, but he [or she] nonetheless consents to being treated as if he [or she] were guilty with no assurances to the contrary." *State* v. *Faraday*, 268 Conn. 174, 205, 842 A.2d 567 (2004).

State *v.* Outlaw

In reviewing this claim, we employ the standard set forth by this court in *State* v. *Payne*, 303 Conn. 538, 34 A.3d 370 (2012). When a defendant raises a claim that an instance of prosecutorial impropriety has "infringed a specifically enumerated constitutional right," the defendant first has the burden of establishing the constitutional violation. Id., 563. Once the defendant has done so, "the burden is then on the state to prove that the impropriety was harmless beyond a reasonable doubt." Id. "[A] defendant who fails to preserve claims of prosecutorial misconduct need not seek to prevail under the specific requirements of [*Golding*], and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) Id., 560.

The appropriate test of whether a constitutional violation has occurred is whether the prosecutor's language was "manifestly intended to be, or was . . . of such a character that the jury would naturally and necessarily take it to be a comment" on the defendant's exercise of his right to a fair trial.[25] (Emphasis omitted; internal quotation marks omitted.) *State* v. *A. M.*, 324 Conn. 190, 201, 152 A.3d 49 (2016). Just as "allowing a prosecutor to comment on the defendant's refusal to testify would be equivalent to imposing a penalty for exercising his constitutional right to remain silent"; id., 200; the state may not use a defendant's decision to exercise his right to a jury trial against him. Consequently, it is inappropriate for a prosecutor to comment—either directly or indirectly—on a defendant's exercise of that right. See, e.g., *State* v. *Thompson*, 118 N.C. App. 33, 41, 454 S.E.2d

---

[25] The " 'naturally and necessarily' " test often is used when a prosecutor is perceived as having commented on a defendant's failure to testify. *State* v. *Jose R.*, 338 Conn. 375, 389, 258 A.3d 50 (2021). Federal courts, however, have applied this test when the alleged violation involves a defendant's right to a jury trial under the sixth amendment to the United States constitution, as it does in the present case. See, e.g., *United States* v. *Ochoa-Zarate*, 540 F.3d 613, 617–18 (7th Cir. 2008).

State *v.* Outlaw

271 (stating that "prosecutorial argument complaining a criminal defendant has failed to plead guilty . . . is no less impermissible than an argument commenting [on] a defendant's failure to testify" and discerning "no distinction between the two in terms of intrusion [on] a criminal defendant's constitutional rights"), review denied, 340 N.C. 262, 456 S.E.2d 837 (1995).

As other courts have previously observed, a prosecutor's reference to the guilty plea of a witness or codefendant may implicate the defendant's decision to exercise his right to a jury trial. See, e.g., *Brooks* v. *State*, 763 So. 2d 859, 864 (Miss. 2000) (prosecutor's criticism of defendant for rejecting plea offer that was accepted by codefendant suggested that his guilt was "foregone conclusion"). Courts have generally distinguished, however, between comments that invoke a guilty plea as evidence of a witness' credibility, and those that contrast a witness' decision to plead guilty with the defendant's decision to go to trial. In *State* v. *Dillard*, 66 Conn. App. 238, 261–62 and n.25, 784 A.2d 387, cert. denied, 258 Conn. 943, 786 A.2d 431 (2001), for example, the Appellate Court held that the prosecutor's statements that one codefendant had "admitted his responsibility" and that another had "put the case behind him" did not infringe on the defendant's right to a jury trial because their guilty pleas were used solely to bolster their credibility. (Internal quotation marks omitted.) Id., 261–62 and n.25. There is broad agreement, however, that drawing an unfavorable comparison with a defendant who has elected to go to trial—for instance, by adding that the defendant has *not* taken responsibility— is unacceptable. See, e.g., *Gabriel* v. *State*, 254 So. 3d 558, 564 (Fla. Dist. App. 2018) (prosecutor's repeated comparisons to witness who pleaded guilty violated defendant's right to fair trial); *People* v. *Williams*, 158 N.E.3d 1143, 1155 (Ill. App.) (defendant's right to fair trial was violated when prosecutor noted witness' guilty

State *v.* Outlaw

plea and then accused defendant of not taking responsibility), appeal denied, 147 N.E.3d 696 (Ill. 2020).

In the present case, we are not persuaded that the prosecutor's comment was a veiled suggestion that the defendant should not have gone to trial. Although prosecutors must exercise caution when discussing a witness' guilty plea, such references are not categorically forbidden. Here, the prosecutor never mentioned the defendant's decision to go to trial. But see, e.g., *People* v. *Herrero*, 324 Ill. App. 3d 876, 887, 756 N.E.2d 234 (2001) (prosecutor's assertion that defendant wanted jury trial in hope that one of jurors would be "suckered in" was "outrageous" (internal quotation marks omitted)), appeal denied, 198 Ill. 2d 600, 766 N.E.2d 242, cert. denied, 536 U.S. 967, 122 S. Ct. 2682, 153 L. Ed. 2d 853 (2002). Additionally, the prosecutor's observation that Rivera "took responsibility for her actions" did not juxtapose Rivera's choice to plead guilty with the defendant's choice to go to trial, because the prosecutor did not suggest that the defendant was avoiding accountability; but see, e.g., *United States* v. *Ochoa-Zarate*, 540 F.3d 613, 617 (7th Cir. 2008) ("[The witness has] at least taken responsibility for his own actions. As of today, this defendant still has not." (Emphasis omitted; internal quotation marks omitted.)); or that he, too, should have taken a plea deal. But see, e.g., *Brooks* v. *State*, supra, 763 So. 2d 862–63 (defendant "was offered the same thing [the witness] was" but "took a chance rolling the dice," and was "relying on [the jury] to turn him loose" (internal quotation marks omitted)).

Instead, the prosecutor commented on Rivera's plea as part of his argument that she was a reliable witness whose testimony was consistent with the evidence presented. This discussion focused entirely on Rivera's credibility, which the prosecutor suggested was buttressed by her admitted involvement in the crime. In

State *v.* Outlaw

highlighting the unique value of eyewitness testimony from coconspirators, the prosecutor briefly referenced Rivera's guilty plea to reinforce that she was such a witness. This statement was particularly relevant in light of the aforementioned questions about Rivera's motivations for testifying, as evidenced by the prosecutor's acknowledgment that "we don't get to pick our witnesses" and that Rivera had "some baggage . . . ." In this context, it is unlikely that the jury would have "naturally and necessarily" perceived the comment that Rivera took responsibility as an implicit criticism of the defendant's exercise of his right to a jury trial. Because the prosecutor confined his remarks to the witness' choice to plead guilty and avoided any negative characterization of the defendant, we conclude that no constitutional violation occurred.

The judgment is affirmed.

In this opinion D'AURIA, MULLINS and ALEXANDER, Js., concurred.


ECKER, J., with whom ROBINSON, C. J., joins, concurring in part and concurring in the judgment. When a juror sleeps for at least one hour during the presentation of evidence in a murder trial, the trial court must do more than simply monitor the sleeping juror and discuss the matter with counsel. As we observed in *State* v. *Brown*, 235 Conn. 502, 668 A.2d 1288 (1995), there are "significant public interests" at stake during a criminal trial, which include not just "the liberty of the accused, but also [protecting] the entire citizenry from overzealous or overreaching state authority." (Internal quotation marks omitted.) Id., 526–27. Given the important public interest in fair and just criminal trials, I agree with Justice McDonald that "it is the duty of the *court*, and not of the *defendant*, to ensure that a preliminary inquiry is conducted," that the trial court's

State *v.* Outlaw

inquiry in the present case was inadequate, and that, "under *Brown*, a more serious inquiry was required." (Emphasis in original.)

That said, I disagree with Justice McDonald that the trial court's failure to conduct such an inquiry was structural error that deprived the defendant, Trevor Monroe Outlaw, of his constitutional right to a fair trial. See, e.g., *United States* v. *McKeighan*, 685 F.3d 956, 974–75 (10th Cir.) (sleeping juror did not deprive defendant of fair trial), cert. denied, 568 U.S. 1019, 133 S. Ct. 632, 184 L. Ed. 2d 411 (2012); *United States* v. *Fernández-Hernández*, 652 F.3d 56, 74–75 (1st Cir.) (same), cert. denied sub nom. *Gonzalez-Mendez* v. *United States*, 565 U.S. 924, 132 S. Ct. 353, 181 L. Ed. 2d 223 (2011); *United States* v. *Freitag*, 230 F.3d 1019, 1023–24 (7th Cir. 2000) (same). In light of the defendant's legitimate concerns regarding the racial composition of the jury and decision not to ask the trial court to inquire further, the duration of time that the juror was observed sleeping in relation to the overall length of the trial, and the nature of the evidence adduced during that short period of time,[1] I conclude that the absence of a more serious inquiry in this case did not render the defendant's trial fundamentally unfair or the proceedings manifestly unjust. I therefore agree with the majority that "the defendant is unable to establish the existence of a constitutional violation, as required under the third prong of" *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Part I of the majority opinion. Accordingly, I concur in part I of the majority opinion.[2]

---

[1] It is unclear from the record, but it appears that the sleeping juror may have missed all or part of the testimony of three witnesses: (1) a paramedic who responded to the shooting, (2) a detective who collected physical evidence from the crime scene, and (3) a detective who collected a buccal swab from the defendant.

[2] I agree with and join parts II, III and IV of the majority opinion.

State *v.* Outlaw

McDONALD, J., concurring in part and dissenting in part. The expectation that jurors will be awake during the presentation of evidence in a criminal trial would seem to be an obvious one. This is because, when a juror is sleeping, the juror cannot possibly hear the testimony, observe the body language of witnesses or view exhibits in the courtroom. It is for this reason that sleeping or inattentiveness is widely considered a form of juror misconduct that warrants reversal when it has denied a criminal defendant a fair trial. See, e.g., *Commonwealth* v. *McGhee*, 470 Mass. 638, 645–46, 25 N.E.3d 251 (2015); see also, e.g., *State* v. *Hughes*, 341 Conn. 387, 417–18, 267 A.3d 81 (2021). This court, in discussing the implications of juror misconduct, has explained that "[a] great deal is at stake in a criminal trial" because "[t]he accused . . . has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction." (Internal quotation marks omitted.) *State* v. *Brown*, 235 Conn. 502, 526–27, 668 A.2d 1288 (1995); accord *In re Winship*, 397 U.S. 358, 363, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).[1] This court has therefore recognized that, although "the trial court has broad discretion to determine the form and scope of the proper response to allegations of jury misconduct"; *State* v. *Brown*, supra, 523–24; in exercising that discretion, it must "zealously protect the rights of the accused." (Internal quotation marks omitted.) Id., 524. Among those rights is that of a fair trial by a panel of impartial jurors. See, e.g., id., 523. "Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to

[1] Similarly, I would posit that the state, as the representative of the people, has a compelling interest in vindicating the rights of the community and the interests of crime victims.

State *v.* Outlaw

the United States constitution.'' Id., 522. Today, a majority of this court permits the trial courts in our state to ease up on the vigilance with which they must safeguard the rights of the accused and allows the trial courts to take a decidedly more relaxed approach to ensuring that a criminal defendant receives a fair trial. The majority focuses on the fact that defense counsel failed to protect the defendant's constitutional rights rather than the fact that the trial court, on the basis of its own independent observation of the courtroom proceedings, did not take affirmative measures to address the situation when it observed a juror sleeping for more than one hour during critical testimony in the trial.

The defendant, Trevor Monroe Outlaw, appeals from his conviction of murder, criminal possession of a firearm, and carrying a pistol without a permit to this court. The defendant raises four issues on appeal, namely, that (1) the trial court abused its discretion when it failed to take any action regarding a sleeping juror, (2) the trial court erred by allowing the prosecutors to elicit testimony pertaining to witnesses' involvement in witness protection programs, (3) the trial court erred in admitting evidence that the state's key witness pleaded guilty to conspiracy for the victim's shooting, and (4) the prosecutor improperly commented on the defendant's coconspirator's pleading guilty to conspiracy in violation of the defendant's right to a jury trial. I agree with the majority as to its resolution of the second, third, and fourth issues on appeal. See parts II, III and IV of the majority opinion. I do not agree with the majority's conclusion that the trial court did not abuse its discretion in failing to take appropriate action in investigating the juror misconduct at issue—the sleeping juror—and, accordingly, I respectfully dissent as to that issue. See part I of the majority opinion.

I agree with the majority's summary of the facts that the jury reasonably could have found pertaining to the

State *v.* Outlaw

crimes at issue in this case. For purposes of this opinion, however, I briefly summarize the facts surrounding the trial court's response to the sleeping juror. During a recess on the first day of trial, the trial court met with counsel and informed them that it had noticed one of the jurors sleeping during the presentation of evidence. Defense counsel stated that he had not observed the behavior and communicated his opposition to immediately removing the juror. Following this conversation, but prior to summoning the jurors, the court stated on the record that it "noted, [at] about 2:30 [p.m.], that [the juror's] eyes had been closed a little bit before that and did [jerk] open, but, essentially, from about 2:30 [p.m.] . . . [until] we recessed at 3:33 [p.m.] or so, he looked to be asleep." The court further noted that "[the court] clerk noticed it as well, as did the monitor, as did, I believe, at least two of the marshals." When the prosecutors were asked whether they had made similar observations, one of the prosecutors responded that both prosecutors had observed the juror sleeping, "not only [during] this afternoon, but also [during] this morning's session" and "during the court's opening remarks before trial commenced." The prosecutor further stated that an "intern [in the state's attorney's office], the victim's family members, as well as several other individuals, witnessed the same behavior." The court then noted that it would "not contemplate any actions at this point" but that it was "contemplating excusing [the juror] if [the court saw] a repeat of that—what appears to be that conduct." That same day, one of the prosecutors mentioned that he again noticed the juror sleeping during the testimony of one or both of the police detectives who had investigated the crimes. After defense counsel again stated that he was not sure whether he had noticed the behavior, the trial court responded that, "[i]f [the court sees that the juror is] doing it again, [the court is] going to take action." The issue was not addressed further during the trial.

State *v.* Outlaw

On appeal, the defendant asserts that the trial court abused its discretion when it failed to take any action regarding the sleeping juror. The defendant concedes that the issue is unpreserved but argues that it can be reviewed pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), because the record is adequate for review and the claim is of constitutional magnitude. Alternatively, the defendant argues that the issue can be reviewed for plain error. See, e.g., *State* v. *Blaine*, 334 Conn. 298, 305–306, 221 A.3d 798 (2019). In support of these contentions, the defendant argues that inattentiveness by a juror is considered a form of juror misconduct and that the trial court had a duty to act when it noticed the juror sleeping throughout the day. The defendant contends that the trial court has this duty to act even in the absence of a specific request by the defense and that, in this case, "the court utterly failed to protect the defendant's rights." The defendant contends that the trial court's lack of action in this case amounts to structural error that requires a new trial. For its part, the state argues that this court should not review the defendant's claim because defense counsel induced the trial court not to take any further action regarding the juror. Alternatively, the state asserts that the defendant cannot successfully prove a constitutional violation under *Golding* or plain error because the trial court reasonably concluded that no further action was warranted.

"Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless

State *v.* Outlaw

error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt.'' (Emphasis omitted; internal quotation marks omitted.) *State* v. *Morel-Vargas*, 343 Conn. 247, 253, 273 A.3d 661, cert. denied, U.S. , 143 S. Ct. 263, 214 L. Ed. 2d 114 (2022).

I agree with the majority's conclusion that the first two prongs of *Golding* are satisfied in this case. I part ways with the majority, however, on the question of whether the defendant has satisfied the third prong of *Golding* by demonstrating that a constitutional violation had occurred that deprived him of a fair trial. On this issue, the majority, quoting *State* v. *Collins*, 38 Conn. App. 247, 259, 661 A.2d 612 (1995), contends that the defense's ''failure to seek [a] determination of [the] nature and extent of [the] alleged misconduct 'seriously undermine[d]' [the] claim that [the defendant] was deprived of [a] fair trial . . . .'' Text accompanying footnote 10 of the majority opinion. This court, in *Brown*, however, explicitly held that it is the duty of the *trial court*, and not of the *defense*, to ensure that a preliminary inquiry is conducted when faced with allegations of jury misconduct. See *State* v. *Brown*, supra, 235 Conn. 526 (''we now hold that henceforth a trial court must conduct a preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case, regardless of whether an inquiry is requested by counsel'' (footnote omitted)). This court's holding in *Brown*, as the majority points out, finds support in the decisions of federal and state appellate courts. See, e.g., *United States* v. *Barrett*, 703 F.2d 1076, 1083 (9th Cir. 1983) (holding that trial court's failure to ''conduct a hearing or [to] make any investigation into the [sleeping juror] question'' was abuse of discretion); *People* v. *Franqui*, 123 App. Div. 3d 512, 512, 999 N.Y.S.2d 40 (2014) (holding that ''[t]he [trial] court should have conducted a probing and tactful inquiry

State *v.* Outlaw

. . . into whether, and to what extent, the juror had
been sleeping, in order to determine whether this behavior rendered him grossly unqualified'' (citation omitted;
internal quotation marks omitted)), appeal denied, 25
N.Y.3d 1163, 36 N.E.3d 98, 15 N.Y.S.3d 295 (2015).

I am sensitive to defense counsel's desire, which was
adamantly communicated to the trial court, that the
sole Black juror not be removed from the jury. I am
equally sensitive to the incredibly difficult spot that
defense counsel's expressed wishes placed the trial court
in—on one hand, the court having to consider the interest of a Black defendant to have at least one member
of the jury be of the same race as him, and, on the
other hand, the court's obligation to ensure that a jury
is fully engaged in, and awake for, the presentation of
the evidence. Recognizing the clear conundrum that the
trial judge faced in this case, I fully appreciate that the
judge tried to do his level best in the moment to navigate
those shoals. But I also must note that nothing in this
record suggests that defense counsel's wish to have the
juror remain was an effort to induce error on the part
of the trial court. See, e.g., *State* v. *Cruz*, 269 Conn. 97,
105, 848 A.2d 445 (2004) (''[i]t is well established that
a party who induces an error cannot be heard to later
complain about that error''). Rather, the record makes
clear, and the majority points out as well, that defense
counsel did not oppose all actions capable of being
taken by the trial court in the present case, such as
questioning the juror. See part I of the majority opinion.
Furthermore, regardless of what action by the court
defense counsel was in favor of, or opposed to, it is
ultimately the hard job of the trial judge to ensure that
the trial is conducted appropriately, and, thus, it is the
trial judge alone who holds the decision-making power
in such a difficult circumstance. See, e.g., *State* v. *Robertson*, 254 Conn. 739, 769, 760 A.2d 82 (2000) (''In a criminal trial, the judge is more than a mere moderator of

State *v.* Outlaw

the proceedings. It is his responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." (Internal quotation marks omitted.)).

Furthermore, the majority finds much support in our holding in *State* v. *Brown*, supra, 235 Conn. 526, that "a preliminary inquiry of counsel" may be an adequate response to allegations of juror misconduct. See part I of the majority opinion. It is true that, in *Brown*, this court determined that, in some circumstances, a preliminary inquiry of counsel may be all that is necessary for a trial court to "assure itself that a defendant's constitutional right to a trial before an impartial jury has been fully protected." *State* v. *Brown*, supra, 528. I disagree, however, with the majority's conclusion that such an inquiry was all that was required in the present case. In *Brown*, this court stated that, "[t]he more obviously serious and credible the allegations [of jury misconduct], the more extensive an inquiry is required . . . ." Id., 531.

There is no question that, in the present case, the allegation of juror misconduct was credible, as it came from the judge himself, and was apparently confirmed to him by several other court personnel and even the prosecutorial team. As to the seriousness of the allegation, there can be no real doubt that a juror who has potentially missed one hour of testimony, by the judge's own observation, creates a serious threat to the defendant's constitutionally guaranteed right to a fair trial.[2] Common sense dictates the conclusion that a juror who is asleep during the presentation of testimony could not possibly be said to have fairly and impartially con-

---

[2] In his brief, the defendant points out that the testimony of the police officers heard on the day the juror was sleeping included information on where shell casings, a Taco Bell food wrapper, and a beer can were found, which the state used to place the defendant and the car at the exact location where the shooting occurred.

State *v.* Outlaw

sidered all of the evidence.[3] Indeed, the trial judge in this case agreed, stating that "a sleeping juror obviously has not heard all the evidence and that inattentiveness could compromise the defendant's guaranteed right to a jury trial." Given the gravity of the potential constitutional violation at play, I would conclude that, under *Brown*, a more serious inquiry was required.

It is highly unlikely that the limited course of action taken by the judge in this case, i.e., inquiring with counsel, could have possibly assured him that the defendant's right to an impartial jury was fully protected, as neither counsel could say whether the juror was, in fact, sleeping. The only person with the information necessary to make a determination as to whether, and for how long, the juror was sleeping, was the juror himself. Because the trial court neglected to question the juror on this issue, it could not possibly have been assured that the defendant had the benefit of an impartial jury or received a fair trial. Therefore, I conclude that the trial court abused its discretion by failing to conduct a more robust inquiry into the misconduct. See, e.g., *State* v. *Brown*, supra, 235 Conn. 524 ("[w]e have limited our role, on appeal, to a consideration of whether the trial court's review of alleged jury misconduct can fairly be characterized as an abuse of its discretion").

Due to the unpreserved nature of this claim, however, the question becomes whether the trial court's abuse of discretion in this case constituted a constitutional violation that "deprived the defendant of a fair trial . . . ." *State* v. *Golding*, supra, 213 Conn. 240; see *In re Yasiel R.*, supra, 317 Conn. 781. I conclude that it did. "[T]he right to a trial by jury guarantees to the

[3] Taken a step further, would a juror who was physically absent from the courtroom for one hour during the presentation of evidence be considered capable of fairly carrying out his or her duty? Of course not. The only meaningful difference in this case is in the fact that the juror remained, in a physical sense, in the courtroom.

State *v.* Outlaw

criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . A necessary component of the right to an impartial jury is the right to have the jury decide the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court.'' (Citations omitted; internal quotation marks omitted.) *State* v. *Hughes*, supra, 341 Conn. 415–16. A juror cannot possibly consider all of the evidence presented if he or she is not *awake* for the presentation of all of that evidence, as the trial judge in this case recognized.[4] As discussed, it was the trial court's responsibility to conduct the appropriate inquiry into the juror misconduct at issue to ascertain whether the defendant's right to a fair trial had been violated.

The majority nevertheless concludes that the trial court's failure to make a specific finding on the record that the juror was, in fact, sleeping requires this court to conclude that the defendant's constitutional rights were not violated. I disagree. The record before us reveals that numerous individuals, including the prosecutors, court clerk, court monitor, two marshals, and the judge himself, observed the juror exhibiting behavior that indicated he was asleep for *at least* one hour of testimony. To conclude that no constitutional violation occurred simply because the trial court failed to properly inquire and make the requisite finding as to the juror misconduct would unfairly punish the defendant for the trial court's own lack of action. This lack of

---

[4] I also note that the jury has an importance and constitutional status beyond the interests of the defendant alone. See, e.g., *Maldonado* v. *Flannery*, 343 Conn. 150, 161, 272 A.3d 1089 (2022) ("the right to a jury trial is enshrined in our constitution and counts among the most vital checks against governmental overreach"). In the present case, although the question rightly centers on the defendant's constitutional rights, it is also the case that the sleeping juror could not have fulfilled his role in service to the overall criminal justice system and the vindication of the community's interests in a fair trial.

State *v.* Outlaw

action on the trial court's part deprived the defendant of a fair trial because the court, by its own inaction, failed to ensure that all jurors were awake and capable of hearing all of the evidence presented against the defendant.

As to whether this constitutional violation is subject to a harmless error analysis, I find the Massachusetts Supreme Judicial Court's decision in *Commonwealth* v. *McGhee*, supra, 470 Mass. 645–46, to be particularly persuasive. In that case, the trial judge was notified by a reliable juror that another juror had "slept through important portions of the trial." Id., 645. As in the present case, the trial judge in *McGhee* "conducted no further inquiry to determine whether and, if so, when the identified juror was sleeping," and, as a result, the Supreme Judicial Court concluded that "there [was] serious doubt that the defendant received the fair trial to which he is constitutionally entitled." (Internal quotation marks omitted.) Id. The court then went on to conclude that "[t]he serious possibility that a juror was asleep for a significant portion of the trial is [a] structural error . . . that so infringes on a defendant's right to the basic components of a fair trial that it can never be considered harmless . . . ." (Internal quotation marks omitted.) Id., 645–46. I would similarly conclude that the serious possibility that the juror was asleep during important testimony in this case is a structural error that raises distinct concerns regarding whether the defendant received a fair trial. See, e.g., *State* v. *Lopez*, 271 Conn. 724, 733–34, 859 A.2d 898 (2004) ("Structural [error] cases defy analysis by harmless error standards because the entire conduct of the trial, from beginning to end, is obviously affected . . . . Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as funda-

mentally fair.'' (Internal quotation marks omitted.)). In this case, the trial court's error in failing to inquire as to whether the juror was sleeping, what testimony the juror had missed, and whether the juror was ultimately fit to deliberate deprived the defendant of basic protections and undermined the reliability of the jury's determination. As such, I would conclude that the trial court's error was structural and not subject to harmless error review.

Ideally, I would remand the case to the trial court for an evidentiary hearing as to whether the juror in question was asleep during the presentation of evidence in this case. See, e.g., *State* v. *Castonguay*, 194 Conn. 416, 436, 481 A.2d 56 (1984) (remanding for evidentiary hearing on whether jurors discussed evidence prior to deliberating). At this point in the litigation, however, I agree with the defendant that ''[i]t would be nearly impossible to accurately assess how much of the testimony the juror missed if there were to be an evidentiary hearing years after the trial.'' I therefore conclude that the defendant's right to a fair trial has been violated, and I would remand the case for a new trial on the murder and carrying a pistol without a permit charges. See, e.g., *State* v. *Hughes*, supra, 341 Conn. 417–18 (juror misconduct requires reversal and new trial when it has denied criminal defendant fair trial); *Commonwealth* v. *McGhee*, supra, 470 Mass. 645–46 (defendant was entitled to new trial when he was denied fair trial due to ''[t]he serious possibility that a juror was asleep for a significant portion of the trial'').

Accordingly, I respectfully dissent as to this first issue and concur with the majority with respect to the other three issues.